07-28-26, and Ms. Tigard. Welcome. Good morning, may it please the court. Article 7 of the treaty does not mandate book-based taxation, and therefore does not force the United States to accept a foreign-based funding that the U.S. branch offered up in no capital. Instead, the treaty permits the United States to adjust the branch books to reflect the profits that might be expected if the branch were separate from independent enterprise, and a separate independent enterprise would not expect to be funded with all debt. No independent bank operates without capital, and by taxing the branch on a separate enterprise basis, the treaty in effect puts foreign banks and domestic banks on equal funding tax rates. Now, the Court of Federal Claims reliance on the 1994 U.K. manual to permit NatWest to claim... Which decision of the Court of Federal Claims? I'm sorry. We have three of them. Nat1, Nat2, and Nat3. This is in reference to Nat2 and Nat3, where the Court adopted the U.K. manual and applied the U.K. manual in the NatWest3 decision. But its reliance on that manual to permit NatWest to claim more interest expense than it could if it were a separate entity, that only provides NatWest an unfair advantage over U.S. domestic banks... Are you giving up on Nat1? Giving up on what one? The Nat1 decision. No, not at all, not at all. If you convince us to overturn Nat1, then Nat2 and Nat3 really... That's correct, that's correct. So why don't you focus on Nat1 for an instance? Sure. Well, in Nat1, the Court did recognize that it's permissible under the treaty to adjust capital from the branch books. The treaty does not dictate any particular capital attribution method. We think both of our methods, in this case, the reg and the corporate reg, are consistent with the treaty, properly interpreted in due regard to U.S. consistent interpretation. But the regulation is consistent with the treaty because nothing in the plain language of the treaty precludes the regulation in this case. For the most part, the Court of Federal Claims was reliant on the commentary, at least to be commentary, to strike down the regulation. But the treaty itself doesn't affirmably endorse it. So don't we really have to know is how you take a look at the extant materials of the time, the treaty, I guess the draft convention, the commentary, the OECD commentary, the actions of the U.K. around that time up to 1980, and the actions of the government up to that time? Aren't those, leaving aside for the moment, whichever way they cut, aren't those the most pertinent materials to the issue before us with respect to NAT 1, as Judge Garza was pointing to? Well, certainly, you can look at all those. Courts will look at the views of the treaty partner. Courts will look at the OECD materials. But the most important thing, after you look at the plain language of the treaty, is the government, the United States, consistent interpretation. It's that interpretation that's entitled in the Supreme Court case law to substantial deference and is given great weight, even if it conflicts with the treaty partner's interpretation. And in my mind, that's the biggest error in NAT 1 is the court really disregarded the U.S. consistent interpretation. Revenue ruling after revenue ruling, technical explanation after technical explanation. The United States was of the view that the regulation was consistent with Article VII. Not only that, but we negotiated treaty after treaty on that basis, and the Senate ratified treaty after treaty on that basis, and the court below, in the NAT 1 decision, ignored that. What if you have a situation where you have one treaty partner saying X, the other treaty partner saying Y, and they're arguing... Both of them have arguments of merit. This is a close case. It's a well-read case on both sides, and both sides have some good points, but what if we have a case where U.K. says one thing, U.S. says the other. Don't we really just have to dig in and look at the treaty and the commentary? That is true. It could sound like he said, she said. Under the case law, as long as the U.S. interpretation is not precluded by the treaty language, it should be referred to. We cited a case in reply to the Sullivan case where the court deferred to the U.S. interpretation of the treaty partner. I believe it was the U.K. in that case. It's an old case. Disagreed. Is this similar to a Chevron type of deference? Don't we have to give to the IRS? It is, but I believe it's even stronger because it's in the context of foreign policy. In the foreign policy area, the deference to the executive branch is advertised. Even though it might be in conflict with the commentary at a particular time. That would be the case, but it's not in fact in conflict with the commentary. The OSCE commentary in our view supports the regulation in this case because if you fear reading of it, it really gives treaty partners a lot of leeway to adjust the books, including it says, quote, all methods to fight tax avoidance, which is one of the purposes of the 1.882-5 red as the court recognized. It didn't follow that to its logical conclusion under the commentary. There's nothing in the commentary that mandates recognizing inter-branch transactions as the court seemed to think. There's nothing in the commentary that precludes using a regular formula to adjust branch books. Was the draft convention a basis for the and you're referring to the draft convention and the commentary with respect to the draft convention, correct? That's correct. Was the draft, it seemed to me, if I'm wrong, that the draft convention was the starting point for the treaty negotiations. Is that correct? They seem to be working from that. They are working from that. There is a difference in the U.S.-U.K. treaty from the draft convention. There's the reasonable allocation of interest expense language in Article 7.3 of the U.S. treaty, which I read at the time when they saw that said, ah, they're putting that in there for the express purpose of permitting U.S. expense allocation regulations, and that brings up another important point, is what were the party's actual expectations at the time the treaty was signed? So you agree that the key period here is it seems the most important period is up to 1980, right? The most important period is the signing of the treaty and then what happened in 1975 to 1980 period, but that doesn't include looking at things that happened afterwards to shed light on the expectations when the party signed the treaty. But the expectations when the party signed the treaty, in this case in 1975, was that both treaty partners had allocation formula that they were using. That is correct. They revised their views on what's committed under Article 7, but that they'd already signed the treaty, they didn't try to negotiate a new protocol, and so that hit our expectations that when we tried to sign the treaty, that we were going to be able to use our regulation. In 1978, that same year, we issued a revenue ruling that made clear that we were going to be applying this regulation to foreign banks under OECD-based treaties. But the dropping of the PW formula by the UK was that an indication that maybe the treaty did not allow it? Well, they didn't tell us about that, but that was their view, internal view, after they had tried to sign the treaty. It was not in compliance with the treaty. It was actually not in compliance with the older treaty. It was 1945 U.S. and UK treaty. But it was still our expectation and our consistent interpretation that the regulation was permitted by the treaty. And it appears that the UK has revised it to use yet again, because the new legislation that they enacted permits allocating capital on the basis of a formula that looks to the capital ratio of the bank as a whole. But that's in 2001. That's correct, but we quoted our brief on page 68, that they said we're looking at the language of article 7 and we believe that it's wide enough to permit these allocation formulas or a comparability standard like the corporate yardstick, but that we didn't have a domestic law taking up our treaty rights. And so therefore, you know, after 1978 we sort of abandoned our treaty rights and wanted to get in line with the United States and the rest of the OECD nations. Does it make any difference if the corporate yardstick only took into account domestic banks and not the national impact of domestic banks? I don't think so. I think when you're trying to figure out how to adjust branches books to figure out how much capital, there's really two places you could look. You could look at the bank is actually, the branch is actually lying on the worldwide capital. So you could look at the capital ratio of the bank as a whole or you could look at what other banks were doing in the area where the permanent establishment is and that's where the domestic banks part of the equation comes in. But here you're dealing with a bank which is not really a domestic bank in the sense that they're retail bankers. They're also bankers for the most part. So they don't deal with the mom and pop type of accounts. I see what you're saying. And that goes to the question of whether the banks that the United States actually chose were comparable or not. And that is the focus of Matt Wells' argument against the corporate yardstick here. And as proposed, we're looking for are comparable banks and the question is if you could find comparable banks, would such a standard be consistent with the treaty? Whether those banks are in fact comparable or not raises a factual issue that could not and was not decided on in summary judgment. If you were to decide to remand this case to the Court of Federal Claims on the basis of the corporate yardstick, Nat West at that point would be free to make its arguments the banks weren't comparable and therefore the yardstick didn't work. But that was one of the reasons why you turned down for the discovery proceeding, right? Because you were trying to discover additional factors to make that argument? No. That was after the corporate yardstick was rejected and Nat West too. And the Court said you are limited to whatever capital has actually been given to this bank. That's all you can adjust for. You can't adjust for separate enterprise hypothetical capital. It was at that point that we said, well, we'd like to discover what capital the Home Office has actually on its books allotted to this bank. And the Court said, no, no, no. You can only look at the branch books under the manual which is incorrect. The manual says you can look at both Home Office books and the branch books. Correct me if I'm wrong. The way I understand it you have no problems with the deductions of interest made to third parties. It's only the issue of deductibility of the interest made to interrelated banks within the Nat West family. Make a determination as to whether or not it's a capital allocation or an unsatisfactory outcome. Well, let me put it this way. If Nat West was totally funded by third party loans, there would still need to be an allocation of capital because no bank can operate without any capital whatsoever. Factually, that's not the case here. It looks like a lot of their loans are coming from interbranch loans as well as third party loans. So what the regulation does is it disregards the interbranch loans that are not used to generate third party assets. I would. Thank you. Any other questions? May it please the court. Your honors are correct that the issue presented by this case is the proper construction of this 1975 treaty between the U.S. and the U.K. and what the treaty provides is a common measure of profits for use in taxing the branch here in the U.S. As I'm sure you realize, it's important to realize how this treaty works. It prescribes a common measure of profits of the U.S. branch of Nat West on which the U.S. is permitted to tax the branch. It also obligates the U.K. to give a tax credit for that tax based on the same measure of profits. It's through that mechanism of having a double taxing authorities agree to one taxing, one credit of the tax that double tax is avoided. That is the whole purpose of the treaty. Now the government's argument proceeds on a surprising premise that the treaty doesn't provide a common measure of profitability in the U.S. branch and that they're free as a result of the treaty not providing such a measure to do what they like in the treaty including capital in disallowed production. But the premise of their argument would be by implication that the treaty has essentially failed of its most important purpose which is to avoid double tax by creating a common expectation between the two taxing parties of how the profits are to be measured. So let me just start out by giving a little bit of context and I know your honors understand this already. The treaty in the case is 32 years old. It doesn't exist anymore. It's been superseded. There's a new treaty in the U.K. The commentary as your honor was mentioning and the model convention that this treaty was based on come from 1963, over 40 years ago. The tax years in the case are over 20 years old. They're in the mid-80s, 81 to 87. And the central question is evaluating the mutual understanding of the treaty partners as you were putting it, with the appropriate materials at that time. Excuse me for jumping in. Do you agree that the key period here is up to 1980? That seems to me to be in order to determine the intention of the parties. Yes, I do agree with that. And just while we're on that point, what we have from the U.S. during that point, on the reg that existed in 1977, for instance, providing for allocation of expenses, etc., the reg specifically recites that treaty agreements prevailed over the reg. So that was in the mix of information at the time. And you're right to focus on that time period because as you might imagine, in the 30 years since this treaty was negotiated and signed, the policy debate about how the best way to go about doing this has continued. And the OECD has continued talking about it, and tax economists have gotten involved, and bank regulators have gotten involved, and the bank regulatory world has changed dramatically. And today, there are different agreements being negotiated between countries. Indeed, there's a different agreement between the U.S. and the U.K. And Ms. Haley, I think, would seem to agree that up to 18 is the most important. Well, much of their briefing, anyway, uses material from these further evolutions of the discussion, in fact, through the 90s and even as recently as this year and last year and the year before that, as somehow bearing on the central meaning of this 1975 agreement. We don't think that's right. We think that's an inappropriate and really not illuminating method of approaching the construction of this 1975 treaty. Well, sometimes, though, subsequent determinations would be very helpful in saying, well, this is what we meant back then, this is the reason why we're taking it now. So it does have some kind of... I suppose it could, but the nature of this discussion has been, you know, proceeded over a 30-year period as the banking business changed, as the bank regulatory environment changed, Basel reports about bank and more sophisticated perhaps techniques at evaluating the economics of the situation and actually applying it in some way that's workable. But that wasn't all present in 1975. And in 1975, when the parties agreed to this contract, as you will see, they agreed to what was billed at the time as a straightforward, common sense, highly practical way to measure profits in the branch that would work in the real world. There is a document in contract law that when you're looking to determine what the correct construction of the contract term is, you look to the conduct of the parties during the period of the contract as evidence of how they construed it. Now, do you think that that has any merit here, that sort of an is any merit in the setting of how the parties construed a treaty? Certainly, and on the UK side, the point you earlier mentioned is perfectly appropriate to look at. In 1978, based on a legal opinion, the UK authorities decided that they did not have authority to impute notional capital. The US branches operated, US bank branches operated in the UK. Clearly evidence that they felt the treaty prevented that from happening. And they continued to tax US branches operating in the UK in that fashion throughout this period. On the US side, as I said before, you have a 77 reg that says that provides the mechanics for allocation of notional capital but that expressly says treaties are superior to this when they exist. And you have another reg that comes out in 1981 that's silent on the role of treaties. And it's not until 1989 all those years later, 14 years later after the treaty was signed that this government, for the first time, asserts that 882.5 the formulistic, the formulaic approach to this can be used. And that is after all the events in the past. I think I was having this question. If you have a situation where you have two parties to a treaty, it's a bilateral treaty, but one party says a provision means X, the other party says it means Y. They both have some arguments in their favor. And, you know, what do we do in that kind of a situation? The cases are pretty clear on this. Indeed, the Xerox case from this court not too long ago demonstrates the proper approach here. That is, the role of the court is to construe the treaty according to the shared expectations of the parties, much like contract construction, contract interpretation. And because of that, these pleas for deference from the U.S. government are not supported in the cases. You're not meant to give blind deference to one treaty partner's view over the other. You are supposed to construe the contract in a way that implements the shared expectations of the party, and, most importantly, in a way that implements the purpose of the agreement. If you look at the Xerox case, the Sumitomo case in the Supreme Court, the most famous Maximo case from the Second Circuit, and then the Supreme Court, that is the role of the court in interpreting the treaty, to find and construe it in light of the shared expectations of the parties, and to implement the purpose of that shared expectation. The government's position in this case, as I've said, by implication, is that the treaty essentially fails of its central purpose because there's no measure of profits prescribed in the treaty. And yet the treaty depends to function on an agreed measure of profits for one taxing jurisdiction to tax the profits and the other taxing jurisdiction to credit the tax paid in the other jurisdictions. Is there a complication in this particular case because it's a banking operation rather than manufacturing operation? Yes, of course. Well, that's the central problem here, is that unlike the manufacturing operation, money is the inventory in this business. Well, money is fungible, too. Yes, but in this business it is inventory. It is bought and sold. Just like in the manufacturing business. Now, the government's regulation has applied to this banking business. I'll put it this way. They're happy to tax the income generated from this highly sophisticated corporate lending business that NatWest was in, but they disallow the expenses associated with borrowing that money to loan it to NatWest customers. In the manufacturing context, this would be... That's not necessarily correct, is it? Yes. They're allowing third-party capital coming in to be charged as an expense. Not true. 882.5, the regulation and issue in the facts of this case. First of all, the right facially disregards all interbank, intrabank transactions, but then it goes on through the use of this artificial capital ratio concept, applying to a notional balance sheet that it creates. On the facts of this case, disallows deductions for expenses actually incurred by NatWest in paying interest to third parties for the funds that NatWest used to loan to its corporate customers. That's because of the notional formula. Yes. It eliminates through the use of that arbitrary capital ratio, which then applies to the balance sheet. It, in fact, imputes capital. And on the facts of this case, in every year in question, disallows deductions for interest payments, interest expense payments, paid. They're actually paid from third parties. Isn't there some kind of a capital base that you would need in the bank even though it's a wholesale banker? Well, the business was highly profitable. I wanted to make that point. Over the years in question, the books and records kept by this business, which were highly sophisticated computerized books and records, showed $140 million in profit made in the U.S. The government's regulation and, coincidentally, perhaps also their litigation position using this constructive corporate yardstick, reach a different result on measuring profitability more than doubling the profitability shown on the books of the branch. So, $882,500 when applied to this branch doubles the profits that the U.S. is seeking to tax. And, just coincidentally, their litigation corporate yardstick, as they call it, achieves exactly the same result. Doubling the profitability shown on the books, doubling the taxes paid payable in the U.S. Don't go back to your inventory aspect of the analysis there. I think that's very helpful because if you have inventory which you can't afford and that costs you money to maintain, that's deductible. Yes. If it comes from the interbank flow, that's where the government says part of it is deductible, part of it is not. Why is that incorrect? Because the treaty requires the taxing jurisdiction to respect the transactions of the branch. The treaty, at its very core, adopts this so-called separate accounts principle. That is, basically, you look at the operations separately, you make sure that it's dealing on an arm's-length basis with the rest of the bank, you can adjust for that, but you look at the operations separately, you respect the well-kept books and records of the branch for doing that. And the commentary could not be clearer on this. Let me just give you the language. A quote from the commentary. The profits to be attributed to the permanent establishment are those which the permanent, that's the branch, in the language of the treaty. This is from 2556 in the appendix. It's the commentary that goes along with the 63 model convention used for the 75 treaty. The profits to be attributed to the branch are those which the branch would have made if, instead of dealing with its head office, it had been dealing with an entirely separate enterprise under conditions and at prices prevailing in the ordinary market. Normally, this would be the same profit that one would expect to be reached by the ordinary process of good business accountancy. In the great majority of cases, therefore, trading accounts of the branch, which are commonly available, if only because a well-run business organization is normally concerned to know what its profitability is of its various branches, will be used by the taxation authorities as a concern to ascertain the profit properly attributable to the establishment. It's clear when you look at the treaty materials the treaty is opting for this separate accounts mechanism. It doesn't really matter to the taxpayer, 30 years later, whether they have a more sophisticated, they think it's a better policy approach to measure profitability. That's fine. What's important to the taxpayer is that there's a shared expectation and an agreement between the two taxes. They can agree on any way to measure the profitability. The only way to avoid double tax is to make sure that agreement stays in place and that the taxing authority is using the same measure of profits as the crediting authority is in crediting the tax paid in the other jurisdiction. That's the way to avoid the risk of double taxation. On the point about disallowance of actual expenses paid to third parties, it's a little complicated, but it is in the appendix at page 10291-92 which is the revenue agent's report on the bank in the years in question. You can see how the application of 8825 as against the balance sheet the bank actually had and reconstructed balance sheet under the regulation, actually works to eliminate, disallow millions of dollars of actual interest expense payments made to third parties. In any event, I know my time is up. I'm still trying to figure out the aspects of accounting. The local enterprise has its own books and records. Within those local books and records, are the interest bank loans accounted for within those books and records, or are they kept separate? No, no. The evidence was undisputed on this point, and that was three. Judge Firestone's opinion, which has not been appealed, you can read the undisputed fact. This branch was operating as a completely independent entity. It was a highly professional wholesale banking operation involved in the markets in the United States, constantly buying and selling funds, constantly buying and selling securities to generate funds, loan funds. They dealt with counterparties in that very active marketplace completely independently, just as they did with counterparties who happened to be other elements of the NatWest Bank. The evidence on that is completely, really undisputed, and Judge Firestone so found in an opinion that has not been appealed. You think that's clear? Definitely clear, and the reason is obvious. They wanted to measure how profitable their branch was. They compensated their employees in the U.S. based on how profitable the branch was. It was important to them to have an accurate measure of how profitable the branch was on an independent basis, and  in the bank. I'm sorry I'm out of time. I would like to say that the government is not entitled to the deference it seeks here. If you look at the treaty cases, that is clear, and particularly in light of the interpretation for which they are seeking deference, which interpretation would, by implication, mean that the treaty has centrally failed in its purpose of common understanding. Thank you very much. Thank you, Your Honor. I just want to provide a few points raised by counsel for the bank. First of all, there is no specific method in the treaty for implementing it separate from the price principle. As the Supreme Court noted in the container court case, which was cited in the reply brief, Article 7-2 is merely a general outline leading to the different countries to use different precise rules to implement it. Article 7-2 doesn't spell out any particular method. It certainly doesn't say, follow the branch books. It's just a standard against which to measure other methods, and that's why in fact the OECD, recognizing that all these different countries are applying all these different methods, creating instances where double taxation may occur has been working hard to develop a consensus on what's the best way to work on interest expense for banks and other types of permanent establishments. The court asked a couple of questions about post-treaty interpretation, and while the proper focus is on 1975 when the treaty was signed leading up to the ratification, the case law is clear that post-treaty materials, I think this is in the O'Connor Supreme Court case and in Stewart, can shed light on what the party's expectations were, and that's why a recent OECD in the UK adoption of its new law, which does not purport to change the separate enterprise principle, but do express permissible methods for implementing it, are relevant in this case. Our briefs make this clear, but I just want to correct something that I thought counsel said, is that the regulation does not disregard inter-branch loans that are actually used to create third-party assets. It will give credit for those inter-branch loans up to 95%. And finally, the branch is not an independent entity. It is relying on the worldwide capital of the bank, which is why the branch books do in fact need to be adjusted. And unless the court has any further questions, yes, the court may ask. It takes into account that a branch operating as a separate entity would have some capital. It's a very conservative number, thank you.